## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

NATURAL RESOURCES DEFENSE                    )
COUNCIL, INC.,                               )
1152 15th Street NW, Suite 300               )
Washington, DC 20005                         )
                                             )
                    Plaintiff                )
                                             )
            v.                               )
                                             )        CIVIL ACTION NO. 16-1861
UNITED STATES ENVIRONMENTAL                  )
PROTECTION AGENCY,                           )
1200 Pennsylvania Ave, NW                    )        **COMPLAINT FOR**
Washington, DC 20260,                        )        **DECLARATORY AND**
                                             )        **INJUNCTIVE RELIEF**
GINA McCARTHY, in her official capacity as   )
Administrator of the United States Environmental )
Protection Agency,                           )
1200 Pennsylvania Ave, NW                    )
Washington, DC 20260,                        )
                                             )
SHAWN GARVIN, in his official capacity as    )
Administrator of EPA Region III,             )
1650 Arch Street                             )
Philadelphia, PA 19103                       )
                                             )
                    Defendants.              )
_____ )

### INTRODUCTION

1. This action challenges the United States Environmental Protection Agency's (EPA) unlawful approval of a total maximum daily load (TMDL) for trash pollution in the Anacostia River and its tributaries (Anacostia River, or river).

2. The Clean Water Act and EPA's implementing regulations define a TMDL as the maximum amount of a pollutant that can be discharged to a waterbody on a daily basis without violating applicable water quality standards.

1

3. In approving the Anacostia River Trash TMDL submitted by the District of Columbia Department of Environment and Energy (DOEE) and Maryland Department of the Environment (MDE), EPA did not identify the maximum amount of trash that can be discharged to the Anacostia River on a daily basis without violating applicable water quality standards.

4. Instead, the Anacostia River Trash TMDL sets the amount of trash that must be prevented from reaching the river or removed from it.

5. By approving a TMDL that does not establish an upper limit on trash pollution in the Anacostia River, EPA has failed to ensure attainment of applicable water quality standards as required by § 303 of the Clean Water Act, 33 U.S.C. § 1313(d)(2), and EPA's implementing regulations, 40 C.F.R. §§ 130.2, 130.7.

6. In 2006, the District of Columbia and Maryland declared that trash pollution in the Anacostia River had reached unacceptable levels.  Ten years later, the river is still blighted by trash, and, as a result of EPA's unlawful approval of the Anacostia River Trash TMDL, there is still no upper limit on the amount of trash that can be discharged to the Anacostia River, despite the statutory requirement to the contrary.  EPA's unlawful approval injures Plaintiff's members, whose use and enjoyment of the Anacostia River is harmed by EPA's failure to ensure attainment of applicable water quality standards.

7. EPA's approval of the Anacostia River Trash TMDL exceeds its statutory authority under § 303 of the Clean Water Act, 33 U.S.C. § 1313, and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), (C).  Plaintiff requests that this Court vacate EPA's approval of the Anacostia River Trash TMDL and remand the matter to the agency for approval of a TMDL that complies with the Clean Water Act.  *See id.* § 706(2).  However, to ensure that the imperfect, but

important, water quality protections provided by the existing TMDL remain in place pending remand, Plaintiff requests that vacatur be stayed until EPA has approved a trash TMDL for the Anacostia River that complies with the Clean Water Act.

## JURISDICTION AND VENUE

8. This action arises under the Clean Water Act, 33 U.S.C. §§ 1251-1388, and the APA, 5 U.S.C. §§ 701-06.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the APA, 5 U.S.C. §§ 702, 704.

9. EPA had a mandatory duty to either approve or disapprove the Anacostia River Trash TMDL within 30 days of its submission by DOEE and MDE.  33 U.S.C. § 1313(d)(2).

10. EPA's approval of the Anacostia River Trash TMDL is a final agency action subject to judicial review under the APA.  5 U.S.C. §§ 702, 704, 706.

11. This Court has the authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 702 and 706.

12. The requested relief would redress the actual, concrete injuries to Plaintiff's members caused by EPA's unlawful approval of the Anacostia River Trash TMDL.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the official residence for Defendants EPA and Gina McCarthy is in the District of Columbia.

## PARTIES

14. Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a not-for-profit environmental and public health organization with about 295,000 members, including over 8,000 members who reside in the District of Columbia and Maryland.  NRDC engages in research, advocacy, media, and litigation related to protecting public health and the environment.  NRDC's mission includes the prevention and mitigation of air and water pollution, harm to fish and wildlife,

and health threats posed by toxic chemicals, in order to protect and maintain NRDC members' health and use and enjoyment of natural resources.  For years, NRDC has worked to address pollution in the nation's rivers, including the Anacostia River.

15. NRDC's members use and enjoy the Anacostia River for recreation, including kayaking and canoeing on the river, bird watching, walking and biking along the Anacostia River Trail, and other means of aesthetic enjoyment.  NRDC's members suffer recreational and aesthetic injury from trash pollution in the Anacostia River, injuries exacerbated and prolonged by EPA's approval of an unlawful and ineffective TMDL for trash.  NRDC participated in the development of the Anacostia River Trash TMDL by submitting public comments.

16. The relief sought by NRDC would remedy the injuries suffered by its members.

17. Defendant EPA is the federal agency responsible for supervising the implementation of the Clean Water Act in the District of Columbia and Maryland.

18. Defendant Gina McCarthy is the Administrator of the EPA.  She is charged with the supervision and management of all decisions and actions of that agency, including those taken pursuant to the Clean Water Act with respect to the District of Columbia and Maryland.  She is being sued in her official capacity only.

19. Defendant Shawn Garvin is the Administrator of EPA Region III, which includes the District of Columbia and Maryland.  He is charged with the supervision and management of all decisions and actions of EPA Region III, including those taken pursuant to the Clean Water Act with respect to the District of Columbia and Maryland.  He is being sued in his official capacity only.

## LEGAL FRAMEWORK

### Legal Requirements for TMDLs

20. Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Clean Water Act sets as an ultimate goal the elimination of "the discharge of pollutants into the navigable waters," and, in the interim, to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." *Id.* § 1251(a)(1), (2).

21. To reach these objectives, the Clean Water Act requires each state and the District of Columbia to enact water quality standards, which are reviewed and approved by EPA. 33 U.S.C. § 1313(a)-(c); *see also id.* § 1362(3) (defining "State" to include the District of Columbia).

22. Water quality standards consist of "designated uses" and "water quality criteria." 33 U.S.C. § 1313(c)(2)(A). Designated uses are the uses a state identifies for a waterbody, such as drinking, boating, and wildlife habitat. 40 C.F.R. § 131.3(f). Water quality criteria are the "constituent concentrations, levels, or narrative statements[] representing a quality of water" necessary to protect the water's designated uses. *Id.* §§ 131.3, 131.11(a). Water quality criteria can be expressed numerically (*e.g.*, a maximum pollutant concentration) or narratively (*e.g.*, a requirement that the water possess a particular aesthetic characteristic, such as being litter-free). *Id.* § 131.11(b).

23. The Clean Water Act requires each State to "identify those waters within its boundaries for which" effluent limitations mandated by the Act "are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A). These waters are

said to be "impaired" by the pollutants that prevent them from attaining water quality standards. *See* 40 C.F.R. § 130.7(d).

24. Each State must compile a list of its impaired waters, called a "303(d) list." Every two years, each State must submit the 303(d) list to EPA. 40 C.F.R. § 130.7(b), (d).

25. For these impaired waters, "[e]ach State shall establish . . . the total maximum daily load, for those pollutants which the Administrator identifies under section 1314(a)(2) of this title as suitable for such calculation." 33 U.S.C. § 1313(d)(1)(C).

26. Pursuant to § 1314(a)(2), EPA has identified "all pollutants" as suitable for the calculation of TMDLs. 43 Fed. Reg. 60662, 60665 (Dec. 28, 1978).

27. TMDLs "shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7(c)(1).

28. Therefore, a TMDL is the greatest amount of a pollutant that can be discharged, or "loaded," to a waterbody on a daily basis without violating water quality standards. 33 U.S.C. § 1313(d)(1)(C); *see also* 40 C.F.R. § 130.2(e) (defining "load" as an "amount of matter or thermal energy that is introduced into a receiving water").

29. A TMDL is calculated by identifying the water's "loading capacity," which is the "greatest amount of loading that a water can receive without violating water quality standards." 40 C.F.R. § 130.2(f).

30. The water's loading capacity is divided among sources of pollution to the water, including point sources, nonpoint sources, and natural sources. 40 C.F.R. § 130.2(i).

31. A "point source" is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).  Point sources include outfalls from storm sewers and sewage plants.

32. The portions of the loading capacity allotted to point sources are called "wasteload allocations."  40 C.F.R. §§ 130.2(h).  Wasteload allocations limit the amount of a pollutant that a point source can discharge.  They are incorporated into point sources' National Pollutant Discharge Elimination System (NPDES) permits.  *Id.* § 122.44(d)(1)(vii)(B).

33. A "nonpoint source" is any means, other than a point source, by which a pollutant is discharged to a waterbody.  Nonpoint sources include surface runoff that reaches a waterbody without traveling through a storm sewer or other discrete conveyance.

34. The portions of the loading capacity allotted to nonpoint sources and natural sources are called "load allocations."  40 C.F.R. § 130.2(g).  Since nonpoint sources are not subject to permitting under the Clean Water Act, states implement load allocations through water quality management plans.  33 U.S.C. § 1313(e)(3)(C).

35. Expressed mathematically, a TMDL is the sum of wasteload allocations, load allocations, and a margin of safety that accounts for uncertainty in the relationship between pollutant loads and water quality.  40 C.F.R. § 130.2(i).

36. States submit TMDLs for impaired waters to EPA, which "shall either approve or disapprove" the TMDL within thirty days.  33 U.S.C. § 1313(d)(2).

37.  NPDES permits must incorporate wasteload allocations from TMDLs, and state water quality management plans must implement load allocations from TMDLs.  TMDLs also serve as informational documents that help regulators and the public assess the current health of a waterbody and guide their efforts to restore it.

**Applicable Water Quality Standards**

38. Pursuant to 33 U.S.C. § 1313(a), the District of Columbia and Maryland have adopted water quality standards applicable to trash in the Anacostia River.

39. The District of Columbia has designated the Anacostia River and all but two of its tributaries as "Class A" waters, which "shall be free of discharges of untreated sewage, litter and unmarked submerged or partially submerged man-made structures which would constitute a hazard to the users."  D.C. Mun. Regs. tit. 21, § 1104.3.  In addition, "[t]he surface waters of the District shall be free from substances in amounts or combinations that . . . [s]ettle to form objectionable deposits," "[f]loat as debris, scum, oil, or other matter to create a nuisance," "[p]roduce objectionable odor, color, taste, or turbidity," injure humans, plants, or animals, or "[i]mpair the biological community that naturally occurs in the waters or depends upon the waters for its survival and propagation."  *Id.* § 1104.1(a)-(f).

40. Maryland requires that "[a]ll surface waters of this State shall be protected for water contact recreation, fishing, and protection of aquatic life and wildlife."  Md. Code Regs. § 26.08.02.07(A).  In addition, Maryland has enacted narrative water quality criteria providing that the "waters of this State may not be polluted by . . . [a]ny material, including floating debris, oil, grease, scum, [and] sludge . . . in amounts sufficient to . . . [b]e unsightly;" produce taste, odor, or an aesthetically objectionable color; "[c]reate a nuisance;" or "[i]nterfere directly or indirectly with designated uses."  *Id.* § 26.08.02.03(B)(2).

**The Administrative Procedure Act**

41. The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Id.* § 706(2)(A), (C).

## FACTUAL BACKGROUND

### Trash Pollution in the Anacostia River

42. The Anacostia River is heavily polluted with trash, including plastic bags, glass bottles, aluminum cans, used tires, shopping carts, Styrofoam containers, yard waste, carpeting, construction materials, and innumerable other types of rubbish.  Trash enters the Anacostia River through point sources when stormwater runoff carries litter to storm drains that empty into the river and when heavy rain causes the District of Columbia's Combined Sewer System to overflow, spilling both sewage and trash into the river.  Trash also enters the river through nonpoint sources when individuals dump trash directly into the river and when windborne litter wends its way to the water.

43. Because trash loading to the Anacostia River depends upon the frequency and intensity of precipitation as well as the whims of illicit dumpers and litterbugs, trash loading to the river is highly variable from year to year and season to season.

44. Trash pollution interferes with water contact recreation, such as boating, and creates an eyesore that hinders aesthetic enjoyment of the river.  Trash pollution also presents a hazard to fish, birds, and other wildlife that live in and near the river.

### Procedural History

45. In 2006, both the District of Columbia and Maryland determined that trash pollution in the Anacostia River violated narrative water quality criteria.  That year, they submitted 303(d) lists to EPA that identified the Anacostia River as impaired by trash.

46. On April 19, 2010, DOEE and MDE released the draft Anacostia River Trash TMDL for public comment.

47. On May 18, 2010, NRDC submitted comments on the draft TMDL.  Those comments argued that the TMDL did not comply with the Clean Water Act or EPA's implementing regulations.  They also contended that the TMDL's unlawful approach would not attain applicable water quality standards.

48. On September 8, 2010, DOEE and MDE submitted the Anacostia River Trash TMDL to EPA for review.

49. On September 21, 2010, EPA issued a final decision approving the TMDL via letters from EPA Region III to DOEE and MDE.

50. Implementation of the TMDL has revealed that its flawed structure hampers its effectiveness as a tool for reducing trash pollution.

51. On October 8, 2015, NRDC and several other organizations submitted a petition to DOEE and MDE, asking the agencies to revise the Anacostia River Trash TMDL.

52. DOEE and MDE denied the petition on November 30 and December 1, 2015, respectively.

53. Nearly six years after the adoption of the TMDL, the Anacostia River remains impaired by trash.

## The Anacostia River Trash TMDL

54. In the Anacostia River Trash TMDL, DOEE and MDE acknowledge that a TMDL is defined as "the total amount of pollutant that can be assimilated by the receiving waterbody while still achieving water quality standards or goals."

55. However, DOEE and MDE ignore that definition by concluding that "it is not necessary to calculate that quantity [*i.e.*, the river's loading capacity] for purposes of this TMDL."

56. Instead, DOEE and MDE estimated the average amount of trash loaded to the Anacostia River each year. They refer to this amount as the "baseline load."

57. DOEE and MDE estimated the baseline load to be 1,262,492 pounds of trash per year.

58. DOEE and MDE assigned to point sources and nonpoint sources portions of the baseline load that those sources should remove from the river each year.

59. DOEE and MDE refer to these apportionments as wasteload allocations and load allocations. EPA regulations define wasteload allocations and load allocations as portions of the waterbody's loading capacity; they are amounts of pollution that point and nonpoint sources may *discharge*. 40 C.F.R. § 130.2(g), (h). By contrast, the "wasteload allocations" and "load allocations" in the Anacostia River Trash TMDL refer to the amount of trash that point and nonpoint sources must *remove from* or *prevent from reaching* the Anacostia River. The TMDL's definition of wasteload allocations and load allocations conflicts with the definitions in EPA's regulations.

60. Although DOEE and MDE's proposed Anacostia River Trash TMDL did not comply with the requirements of the Clean Water Act and EPA's implementing regulations, EPA still approved it.

61. In approving the TMDL, EPA rubber stamped DOEE and MDE's conclusion that removing from the river an amount of trash equal to the baseline load would result in compliance with applicable water quality standards. EPA reached this conclusion without addressing information indicating that the baseline load is not a reliable estimate of average annual trash loading.

62. DOEE and MDE calculated the baseline load, in part, by estimating trash loading rates for different categories of land use throughout the watershed.

63. DOEE and MDE derived these estimates from data collected through stormwater outfall monitoring.  DOEE measured the amount of trash discharged from ten stormwater outfalls in the District of Columbia between March and August of 2009. MDE collected similar measurements at eight stormwater outfalls in Maryland between October 2008 and July 2009. Thus, the agencies gathered data from 18 of the 3,225 stormwater outfalls that discharge to the Anacostia River.

64. DOEE and MDE identified the land use categories draining to each of the eighteen stormwater outfalls, and then used monitoring data to calculate trash loading estimates for those land use categories.  For instance, if a stormwater outfall drained stormwater runoff and trash from a low-density residential area in Maryland, then MDE used data from that outfall to estimate the trash loading rate for low-density residential areas in the Maryland portion of the watershed.

65. DOEE and MDE calculated separate loading rates for land use categories in their respective jurisdictions.  For several land use categories, DOEE and MDE arrived at radically different estimates of trash loading rates for the same type of land use.  For example, DOEE's loading rate for low-density residential areas was 4.52 pounds per acre per year, 278 percent higher than MDE's estimate of 1.19 pounds per acre per year.  DOEE's estimates for institutional, commercial, and industrial areas were 25.45, 22.08, and 18.90 pounds per acre per year, respectively.  MDE estimated the same loading rate for all three categories:  2.22 pounds per acre per year.

66. When presented with these differences between the jurisdictions' loading rate estimates, EPA responded that they "are likely explained by the inherent differences in the

jurisdictions." EPA has not explained why the same types of land use would cause so much more trash loading in the District of Columbia than in Maryland. EPA did not address the more likely explanation: there is insufficient monitoring data to calculate reliable trash loading estimates for land use categories in the watershed.

67. Population growth is another factor undermining the reliability of the baseline load as a measure of average annual trash loading to the Anacostia River. Population in the D.C. metropolitan region is increasing. A larger population generates more trash, which means that trash loading to the river is likely to increase. The baseline load, however, is static. It does not account for increasing population.

68. EPA found that trash loading to the Anacostia River is subject to high annual variability. Therefore, even if the baseline load represents a reasonably accurate estimate of average annual trash loading to the river, trash loading will still exceed the baseline load in some years.

69. EPA did not determine the amount of trash that might be discharged to the river during years in which actual loading exceeds the baseline load. EPA did not determine the amount of trash in excess of the baseline load that could be discharged to the river without violating applicable water quality standards. EPA did not cap the amount of trash that could be discharged to the river. Consequently, EPA could not reasonably conclude that it had established the TMDL at a level necessary to implement applicable water quality standards. *See* 33 U.S.C. § 1313(d)(1)(C).

70. If EPA had established a maximum load for trash as the Clean Water Act requires, jurisdictions implementing this TMDL would have measured progress toward attainment of applicable water quality standards by actual and observable improvements in the river's water quality. Instead, the TMDL calls for the removal or prevention of a fixed amount of trash pollution.

Implementing jurisdictions cannot accurately predict the pounds of trash pollution prevented by educational programs, plastic bag fees, and other non-structural approaches.  There is no way to know if implementing jurisdictions have removed the baseline load from the river—a problem created by the unlawful structure of this TMDL.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### EPA Violated the Clean Water Act's Requirements for TMDLs

71. NRDC realleges and incorporates the allegations of all the preceding paragraphs of this Complaint.

72. The Clean Water Act and EPA's implementing regulations require States to prepare and EPA to approve total maximum daily loads for impaired waters.

73. The Anacostia River Trash TMDL does not establish the total maximum daily load of trash that may be discharged to the Anacostia River while still attaining water quality standards.

74. EPA's approval of the Anacostia River Trash TMDL violates the Clean Water Act, 33 U.S.C. § 1313(d), and EPA's implementing regulations, 40 C.F.R. §§ 130.2, 130.7.  Its approval of the TMDL constitutes agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of the Administrative Procedure Act.  5 U.S.C. § 706(2)(A), (C).

### SECOND CAUSE OF ACTION
### EPA's Conclusion that the TMDL Was Established at a Level Necessary to Implement Applicable Water Quality Standards Was Arbitrary and Capricious

75. NRDC realleges and incorporates the allegations of all the preceding paragraphs of this Complaint.

76. The Clean Water Act requires States to prepare and EPA to approve TMDLs "established at a level necessary to implement the applicable water quality standards." 33 U.S.C. § 1313(d)(1)(C).

77. In approving the Anacostia River Trash TMDL, EPA concluded that the baseline load was an accurate estimate of average annual trash loading to the river. EPA's explanation for this conclusion is arbitrary and capricious because EPA did not adequately address evidence in the record that the baseline load was not a reliable estimate of average annual trash loading.

78. EPA's conclusion that the TMDL was established at a level necessary to implement applicable water quality standards is arbitrary and capricious because the TMDL does not set an upper limit on the amount of trash that can be discharged to the Anacostia River.

79. For the foregoing reasons, EPA's approval of the Anacostia River Trash TMDL is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A), (C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

80. Declare that Defendants' approval of the Anacostia River Trash TMDL violated the Clean Water Act and EPA regulations for the reasons alleged herein;

81. Enter an order vacating EPA's approval of the TMDL;

82. Remand the matter to EPA and direct EPA to disapprove the TMDL as contrary to law;

83. Direct EPA to promulgate a new trash TMDL for the Anacostia River that complies with the Clean Water Act within a reasonable time, 33 U.S.C. § 1313(d)(2);

84 Stay the order of vacatur until a trash TMDL for the Anacostia River that complies with the Clean Water Act is in effect;

85. Retain jurisdiction over this action until Defendants fully remedy the violations of law described herein;

86. Award Plaintiff its fees, costs, and other expenses as provided by applicable law; and

87. Issue such other relief as the Court deems just, proper, and equitable.

Respectfully submitted this 19th day of September, 2016.

/s/ *Hope Babcock*

Hope Babcock, Director
Fed/D.C. Bar No.: 14639
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, DC 20001
Phone: 202-662-9549
Fax: 202-662-9634

*Counsel for Plaintiff Natural Resources Defense Council, Inc.*