UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>    Defendants. | Civil Action No. 16-1861 (JDB) |

## MEMORANDUM OPINION

When a body of water becomes sufficiently polluted, the Clean Water Act ("CWA") requires the state responsible for that waterbody to develop a plan to return it to acceptable pollution levels. See 33 U.S.C. § 1313(d)–(e). As part of this exercise, the state must calculate the "total maximum daily load" of the offending pollutant that the waterbody can bear before "applicable water quality standards" are breached. Id. § 1313(d)(1)(C).

In 2009 and 2010, pursuant to these provisions, Maryland and the District of Columbia jointly developed a plan to limit the amount of trash that makes its way into the Anacostia River. But instead of setting a maximum amount of trash that could enter the river before it failed to meet its water quality standards, the two jurisdictions set a minimum amount of trash that would have to be removed from the river (or prevented from entering it) for those standards to be satisfied. In this action, plaintiff Natural Resources Defense Council ("NRDC") challenges the Environmental Protection Agency's ("EPA") decision to approve the plan, arguing that its removal-based approach is inconsistent with the plain language of the CWA. For the reasons given below, the Court agrees with NRDC. EPA's approval of the plan will be vacated and remanded to the agency, but the vacatur will be stayed to allow time to develop a new plan.

## BACKGROUND

**I. STATUTORY AND REGULATORY BACKGROUND**

The CWA is a comprehensive water quality statute enacted by Congress "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). It ultimately seeks to eliminate "the discharge of pollutants into the [nation's] navigable waters" and, in the interim, to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on water." Id. § 1251(a)(1)–(2). To achieve these goals, the statute requires that each state and the District of Columbia "institute comprehensive water quality standards establishing water quality goals for all intrastate waters." PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology, 511 U.S. 700, 704 (1994); see 33 U.S.C. § 1313(a)–(c).

"A water quality standard defines the water quality goals of a water body . . . by designating the use or uses to be made of the water and by setting criteria that protect the designated uses." 40 C.F.R. § 131.2. Thus, to set water quality standards for a particular waterbody, a state first identifies its "designated uses," 33 U.S.C. § 1313(c)(2)(A), which might include drinking water, recreation, wildlife preservation, navigation, agriculture, or industry, see 40 C.F.R. §131.2; Anacostia Riverkeeper, Inc. v. Jackson, 798 F. Supp. 2d 210, 215 (D.D.C. 2011) ("Anacostia Riverkeeper I"). The state then sets "water quality criteria" that represent the "quality of water that supports" each use and are "expressed as constituent concentrations, levels, or narrative statements." 40 C.F.R. § 131.3(b).

Once a state establishes water quality standards for its navigable waters, EPA must approve them. 33 U.S.C. § 1313(c)(3). The state must then "identify those waters within its boundaries" that do not meet applicable water quality standards, which are known as impaired waters. Id. §

1313(d)(1)(A). Each state must compile a list of its impaired waters—a "303(d) list"—and submit it to EPA on a biennial basis. 40 C.F.R. § 130.7(b)(3), (d).

When a state identifies a waterbody as impaired, it must establish a "total maximum daily load" ("TMDL") for the pollutants causing the impairment. 33 U.S.C. § 1313(d)(1)(C). While the phrase "total maximum daily load" is not defined in the CWA, see id. § 1362 (defining certain terms), the statute states that "[s]uch load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality," id. § 1313(d)(1)(C).

EPA regulations further specify the process for creating a TMDL. First, the agency's regulations define a waterbody's "loading capacity" as the "greatest amount of loading [i.e., introduction of a pollutant] that a water can receive without violating water quality standards." 40 C.F.R. § 130.2(e)–(f). The regulations then distinguish between "wasteload allocation[s]," which represent "[t]he portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources,"[1] id. § 130.2(h), and "[l]oad allocation[s]," which represent "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources," id. § 130.2(g). A waterbody's TMDL for a particular pollutant is defined as "[t]he sum of the individual [wasteload allocations] for point sources and [load allocations] for nonpoint sources and natural background."

---

[1] The CWA divides pollution sources into two types: point sources and nonpoint sources. A point source is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, [or] tunnel." 33 U.S.C. § 1362(14). A nonpoint source is any other manner by which pollution reaches water, such as litter that is dropped off a bridge. See Anacostia Riverkeeper I, 798 F. Supp. 2d at 214. Point sources may not discharge pollution into navigable water without a permit, see 33 U.S.C. § 1311(a), and these permits impose "effluent limitations" which reflect the "best practicable control technology currently available," id. § 1311(b); see id. § 1342(a)(1) (authorizing the issuance of permits). Nonpoint sources, by contrast, are not subject to the CWA's permitting requirement. Anacostia Riverkeeper I, 798 F. Supp. 2d at 214–15.

Id. § 130.2(i). A TMDL "can be expressed in terms of either mass per time, toxicity, or other appropriate measure." Id.

Once a state establishes a TMDL, it must submit that TMDL to EPA for approval. 33 U.S.C. § 1313(d)(2). If EPA disapproves a TMDL, it must establish a TMDL that it "determines necessary to implement the water quality standards applicable to such waters." Id. Once EPA either approves a state's TMDL or establishes a TMDL that it determines will satisfy the relevant water quality standards, the implementation of the TMDL rests largely with the state. See Sierra Club v. Meiburg, 296 F.3d 1021, 1031 (11th Cir. 2002). The CWA requires states to engage in a "continuing planning process" to implement their TMDLs, however, 33 U.S.C. § 1313(e)(3)(C), and pollution permits must be "consistent with the assumptions and requirements of any available wasteload allocation" in an applicable TMDL, 40 C.F.R. § 122.44(d)(1)(vii)(B).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Anacostia River

The Anacostia River flows from Maryland to the District of Columbia and spans more than 170 square miles. AR 3006.[2] Its watershed is highly urbanized and is home to over 800,000 people, AR 3007; as a result, a significant amount of trash makes its way into the river each year, see Compl. [ECF No. 1] ¶ 42 (alleging that the river is polluted by "plastic bags, glass bottles, aluminum cans, used tires, shopping carts, Styrofoam containers, yard waste, carpeting, construction materials, and innumerable other types of rubbish"). Trash enters the river from both point sources, such as storm drains and sewer systems, and nonpoint sources, such as litter that is deposited directly into the river. AR 3032–33.

---

[2] Citations to "AR" numbers are references to pages in the administrative record [ECF No. 26].

Maryland and the District of Columbia have each established designated uses and water quality standards applicable to their portions of the Anacostia River. AR 3013–16. The District designated its portions of the river for recreational, aesthetic, and navigational uses (among others), while Maryland's waters are designated for recreation, fishing, and protection of aquatic life. AR 3014–15. Maryland and the District's water quality standards are expressed as narrative descriptions, which set "unacceptable levels of trash in subjective terms." AR 3075. According to the District's water quality standards, waters are required to "be free of discharges of untreated sewage, litter and unmarked submerged or partially submerged man-made structures that would constitute a hazard to . . . users." AR 3014 (quoting D.C. Mun. Regs. tit. 21, § 1104.3). Maryland's water quality standards state that water may not be polluted by any material in amounts sufficient to be "unsightly" or a "nuisance" or to "[i]nterfere directly or indirectly with designated uses." AR 3015 (quoting Md. Code Regs. 26.08.02.03(B)(2)).

Based on the interpretations of their water quality standards' narrative criteria, both Maryland and the District determined that the Anacostia River was impaired by trash pollution and, accordingly, added the river to their 303(d) lists. AR 3013. This required the District and Maryland to create a trash TMDL for the river. See 33 U.S.C. § 1313(d).

**B. The Anacostia River Trash TMDL**

Following the river's designation as impaired, the District of Columbia Department of Energy and the Environment ("DOEE") and the Maryland Department of the Environment ("MDE"), in collaboration with EPA and a number of environmental groups, developed a joint TMDL for the shared waterbody. The agencies began by collecting data using two methods: monitoring trash from stormwater outfalls and counting trash in streams.

5

DOEE monitored ten stormwater outfalls in the District whenever there was a rainfall of at least 0.25 inches between March and August 2009. AR 3018. DOEE then installed trash traps with one-inch diameter netting to collect trash that flowed through the outfalls. Id. According to EPA, "[r]ainfall played an important role in monitoring trash pollution because rain increases the transportation of trash to and through streams and sewer systems." EPA's Cross-Mot. for Summ. J. [ECF No. 15] at 12 ("EPA MSJ") (citing AR 3051). Similarly, MDE monitored eight stormwater outfalls between October 2008 and July 2009. AR 3021–22.

In addition to the stormwater outfall monitoring, both DOEE and MDE conducted in-stream trash monitoring to estimate trash loading for nonpoint sources. AR 3025–31. Volunteers from local watershed groups walked along the river to identify and count visible items of trash in the water. AR 3025, 3029. DOEE conducted this monitoring at 46 locations once per season between August 2007 and June 2008. AR 3025–28. MDE conducted in-stream monitoring at 30 locations between June 2008 and August 2009. AR 3029.

Once the agencies had collected sufficient data, they calculated what they called the "baseline load" for each point and nonpoint source of pollution, which represented the estimated amount of trash discharged into the river in an average year from that source. AR 3044. Then, by summing these quantities together and adding a 5% margin of safety, the agencies established a TMDL for the entire river (the "Anacostia River Trash TMDL" or "Trash TMDL"). AR 3044, 3049. As the agencies acknowledged, the Trash TMDL was expressed as "the quantity of trash that must be captured or removed for the waterbody to achieve the narrative criteria, rather than as the amount of trash that can be added to the waterbody without being objectionable, unsightly or constituting a nuisance." AR 3044. Nonetheless, they concluded that the Trash TMDL would "result in compliance with [the river's] narrative [water quality] standard[s], as determined by the

6

agencies responsible for interpreting the standard[s]." Id. As written, the TMDL requires that approximately 1.3 million pounds of trash be removed from or prevented from entering the river each year. AR 3049–51.

Maryland and the District submitted their TMDL to EPA in September 2010. AR 3113. EPA recognized that, "[u]nlike most TMDLs, which are expressed in positive terms of the loads of a pollutant that may be added to a waterbody, these trash TMDLs are expressed in the negative, i.e., in terms of quantities of trash that must be captured, prevented from entering, or removed from the waterbody." AR 3114. But "given the nature of trash and how it is transported to the waterbody," EPA concluded that the TMDL's "expression . . . in terms of trash to be captured, prevented from entering, or removed from the waterbody is an 'appropriate measure.'" AR 3120–21 (quoting 40 C.F.R. § 130.2(i)). EPA therefore approved the TMDL on September 21, 2010. AR 3112.

### C. NRDC Files Suit

In September 2016, after unsuccessfully petitioning DOEE and MDE to revise the Trash TMDL, NRDC filed this action challenging EPA's approval of the TMDL under the Administrative Procedure Act ("APA").[3] See Compl. ¶¶ 51–52, 74, 79. In its complaint, NRDC alleges that "[i]mplementation of the TMDL has revealed that its flawed structure hampers its effectiveness as a tool for reducing trash pollution," Compl. ¶ 50, and that "[n]early six years after the adoption of the TMDL, the Anacostia River remains impaired by trash," id. ¶ 53.

NRDC moved for summary judgment on its APA claims, and EPA filed a cross-motion for summary judgment. Thereafter, the District of Columbia Water and Sewer Authority ("D.C.

---

[3] APA suits are subject to the six-year limitations period that applies to all suits against the United States under 28 U.S.C. § 2401(a). Impro Products, Inc. v. Block, 722 F.2d 845, 850 n.8 (D.C. Cir. 1983).

Water") intervened as a defendant and filed its own summary judgment motion. See Intervenor-Def. D.C. Water's Mot. & Br. in Supp. of Cross-Mot. for Summ. J. [ECF No. 17] ("D.C. Water MSJ"). All three summary judgment motions are currently pending before the Court.

## LEGAL STANDARD

Because NRDC seeks judicial review of an agency action, the standard for summary judgment under Federal Rule of Civil Procedure 56 does not apply. St. Francis Med. Ctr. v. Price, 239 F. Supp. 3d 237, 242 (D.D.C. 2017), appeal docketed, No. 17-5098 (D.C. Cir. argued Feb. 12, 2018). Rather, the Court must evaluate the agency's action based solely on the administrative record using the standards of review prescribed by the APA. See 5 U.S.C. § 706.

An agency's interpretation of a statute that it administers is entitled to deference under the familiar two-step Chevron framework. First, the Court asks "whether Congress has spoken directly to the precise question at issue." Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842 (1984). If so, then "that is the end of the matter," since "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842–43. If not, the question becomes "whether the agency's answer is based on a permissible construction of the statute." Id. at 843. An agency's interpretation of its own regulations is similarly entitled to deference unless "plainly erroneous or inconsistent with the regulation." Auer v. Robbins, 519 U.S. 452, 461 (1997) (citation omitted).

## DISCUSSION

NRDC argues that the Trash TMDL violates both the CWA and EPA's own regulations because, instead of setting a maximum daily amount of trash that can enter the river, it sets a minimum amount of trash that must be removed. See Pl.'s Mot. for Summ. J. [ECF No. 10] at 15–22. According to NRDC, this violates not only the CWA's statutory command that a "total

8

maximum daily load" be established for the river, see 33 U.S.C. § 1313(d)(1)(C), but also the agency's own regulations, which define a TMDL in terms of the "greatest amount of [a pollutant] that a water can <u>receive</u> without violating water quality standards," 40 C.F.R. § 130.2(f) (emphasis added). For these reasons, NRDC maintains, EPA's approval of the TMDL was "arbitrary, capricious, . . . [and] not in accordance with law." 5 U.S.C. § 706(2)(A).[4]

The Court "begin[s], as always, with the statute's language." <u>Friends of the Earth, Inc. v. EPA</u>, 446 F.3d 140, 144 (D.C. Cir. 2006). Section 1313(d)(1)(C) provides, in relevant part:

> "Each State shall establish for [its impaired] waters . . . the <u>total maximum daily load</u>, for those pollutants which the Administrator identifies . . . as suitable for such calculation. Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality."

(emphasis added). Though no court has yet addressed the meaning of the terms "maximum" and "load" in the phrase "total maximum daily load," the Court's reading of those terms is guided by the D.C. Circuit's analysis in <u>Friends of the Earth</u>, where that court determined the meaning of the term "daily" in the same phrase. See 446 F.3d at 142.

In that case, EPA had approved one TMDL that limited "the <u>annual</u> discharge of oxygen-depleting pollutants" into the Anacostia River and another that limited "the <u>seasonal</u> discharge of pollutants contributing to turbidity." <u>Id.</u> at 143. Reversing the district court, the D.C. Circuit rejected EPA's reading of the term "daily" and held that it failed at <u>Chevron</u>'s first step:

> Nothing in [§ 1313(d)(1)(C)'s] language even hints at the possibility that EPA can approve total maximum "seasonal" or "annual" loads. The law says "daily." We see nothing ambiguous about this command. "Daily" connotes "every day." See <u>Webster's Third New International Dictionary</u> 570 (1993) (defining "daily" to

---

[4] NRDC also argues that EPA's conclusion that the Trash TMDL was "established at a level necessary to implement the [Anacostia River's] water quality standards" was arbitrary and capricious. 33 U.S.C. § 1313(d)(1)(C); see Pl.'s Mot. for Summ. J. at 22–28. Because the Court agrees with NRDC that EPA's approval of the TMDL was contrary to the CWA and EPA's regulations, however, it will not address this second argument.

9

mean "occurring or being made, done, or acted upon every day"). Doctors making daily rounds would be of little use to their patients if they appeared seasonally or annually. And no one thinks of "[g]ive us this day our daily bread" as a prayer for sustenance on a seasonal or annual basis. Matthew 6:11 (King James).

Id. at 144. Thus, because the statute "spoke[] directly to the precise question at issue," Chevron, 467 U.S. at 842, the court afforded EPA's interpretation no deference and remanded to the district court with instructions to vacate the agency's approval of both TMDLs, see 446 F.3d at 148.

The D.C. Circuit's reasoning in Friends of the Earth is controlling here. The words "maximum" and "load" each have an unambiguous meaning. A "maximum" is "an upper limit allowed by law or other authority" or "the greatest quantity or value attainable in a given case." Maximum, Webster's Third New International Dictionary 1396 (1993). Similarly, a "load" is "the quantity that can be . . . carried at one time by an often specified means of conveyance." Load, Webster's Third 1325; see id. (giving the example of "a dump truck with a full load of sand"). The plain meaning of "maximum load" in § 1313(d)(1)(C), therefore, is the greatest quantity of a pollutant that a waterbody can bear before the applicable water quality standards are violated. Accord Envt'l Def. Fund, Inc. v. Costle, 657 F.2d 275, 294 (D.C. Cir. 1981) ("[TMDLs] set the maximum amount of a pollutant which can be contributed into a stream segment without causing a violation of the water quality standards." (emphases added)); Am. Farm Bureau Fed'n v. EPA, 792 F.3d 281, 299 (3d Cir. 2015) ("TMDLs set the maximum amount of pollution a water body can absorb before violating applicable water quality standards." (emphases added)); Anacostia Riverkeeper, Inc. v. Jackson, 713 F. Supp. 2d 50, 51 (D.D.C. 2010) ("Anacostia Riverkeeper II") ("[TMDLs] define the maximum amount of a pollutant that can enter a segment of water and still permit that water to meet water quality standards." (emphases added)).

EPA's own regulations confirm this definition. The agency defines the term "[l]oad" as "[a]n amount of matter . . . that is introduced into a receiving water." 40 C.F.R. § 130.2(e)

10

(emphases added). Moreover, the phrase "[t]otal maximum daily load" is defined as the "sum of the individual [wasteload allocations] for point sources and [load allocations] for nonpoint sources." Id. § 130.2(i). Both wasteload allocations and load allocations are in turn defined as "portion[s] of the receiving water's <u>loading capacity</u>," id. § 130.2(g)–(h) (emphasis added), and the term "loading capacity" is defined as the "greatest amount of loading that a water can <u>receive</u> without violating water quality standards," id. § 130.2(f) (emphasis added). Thus, the agency itself defines a TMDL in terms of the quantity of a pollutant that enters a waterbody.

Contrary to this statutory and regulatory authority, the Trash TMDL "is expressed as the quantity of trash that must be captured or removed for the waterbody to achieve the narrative criteria." AR 3044. But nothing in the CWA suggests that the word "maximum" can mean "minimum," or that the word "load" can refer to a quantity of pollution either that is removed from or that is prevented from entering a waterbody. Cf. <u>Friends of the Earth</u>, 446 F.3d at 144.[5] A speed limit would be no limit at all if it simply required drivers to slow down ten miles per hour. Nor, to take NRDC's example, could a room's maximum occupancy be defined in terms of a number of people that must leave the room every hour. See Pl.'s Mot. for Summ. J. at 17. Because the Trash TMDL fails to set a "maximum load" within the plain meaning of that phrase, it runs afoul of the definition of "total maximum daily load" in both the CWA, 33 U.S.C. § 1313(d)(1)(C), and EPA's own regulations, 40 C.F.R. § 130.2(i). EPA's construction of the CWA is therefore due no deference, and its decision to approve the TMDL will be set aside. See 5 U.S.C. § 706(2).

EPA's arguments to the contrary are unpersuasive. The agency first relies on out-of-circuit precedents to argue that while the individual words in the phrase "total maximum daily load" may

---

[5] EPA's attempt to distinguish <u>Friends of the Earth</u> is unpersuasive. True, that case addressed the meaning of a different word in the phrase "total maximum daily load." See EPA MSJ at 22. But the agency does not explain why the decision's <u>reasoning</u>—which focused on the word's plain meaning—does not apply here with equal force.

11

be unambiguous, the phrase as a whole "is susceptible to a broader range of meanings." Nat. Res. Def. Council, Inc. v. Muszynski, 268 F.3d 91, 98 (2d Cir. 2001) (cited in EPA MSJ at 21); see EPA MSJ at 21 (citing Am. Farm Bureau, 792 F.3d at 297 (noting "courts' consistent determinations that 'total maximum daily load' is ambiguous")). In Muszynski, for example, the Second Circuit held that a TMDL could be expressed as "an hourly, weekly, monthly, or annual load," reasoning that a literal construction of the term "daily" would be "absurd, especially given that for some pollutants, effective regulation may best occur by some other periodic measure than a diurnal one." 268 F.3d at 98–99; see id. at 97 ("Congress, in one sentence, directs EPA to approve TMDLs for hundreds of different pollutants in thousands of different waterbodies, and it is excessively formalistic to suggest that EPA may not express these standards in different ways, as appropriate to each unique circumstance." (citation omitted)); see also Am. Farm Bureau, 792 F.3d at 295, 298 (rejecting a similar "textual argument at Step One" of Chevron and approving a TMDL that, among other things, "allocat[ed] . . . pollution levels among different kinds of sources" and prescribed "a timeframe for complying with [its] requirements").

Like the pollutants at issue in Muszynski, EPA suggests, trash has "unique characteristics" that make it more difficult to measure the quantity of trash that has <u>entered</u> a river than to measure the quantity of trash that has been <u>removed</u> from (or prevented from entering) it. EPA MSJ at 9; see id. at 9–10 (explaining that "[u]nlike many other pollutants," trash "is not associated with a single category of dischargers" and that "flow does not dilute trash; it merely transports it"); see also D.C. Water MSJ at 25 ("Measuring trash is not the same as measuring other pollutants where small samples can be taken and their contents analyzed to establish a concentration."). Thus, the argument goes, when read in light of these practical difficulties, the term "total maximum daily load" is ambiguous. See EPA MSJ at 22 ("[T]he meaning—or ambiguity—of certain words or

12

phrases may only become evident when placed in context." (quoting Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 666–67 (2007))).

The Court does not doubt EPA's uncontested assertions regarding the difficulty of measuring trash pollution. But even if the Court were persuaded by the Second Circuit's reasoning in Muszynski, the D.C. Circuit has explicitly rejected that court's approach. See Friends of the Earth, 446 F.3d at 146 (explaining that "[i]n this circuit . . . agencies seeking to demonstrate absurdity have an exceptionally high burden" and that EPA had failed to satisfy this burden because, "as counsel conceded at oral argument, establishing daily loads makes perfect sense for many pollutants"). Moreover, the D.C. Circuit has refused to credit exactly the sort of pragmatic arguments that EPA advances here, explaining that a court cannot "set aside a statute's plain language simply because the agency thinks it leads to undesirable consequences in some applications."[6] Id. at 145. This Court is not free to disregard the D.C. Circuit's views on these matters and embark on a path marked by other courts of appeals, and it will decline EPA's invitation to do so here.

Equally unavailing is EPA's reliance on its own regulations, which state that "TMDLs can be expressed in terms of either mass per time, toxicity, or other appropriate measure." 40 C.F.R. § 130.2(i); AR 3120–21 (EPA's decision rationale, concluding that the Trash TMDL's

---

[6] Even if it were proper for the Court to consider these arguments, their force is diminished considerably because here, as in Friends of the Earth, "the agency's predicament is largely of its own creation":

> The CWA requires the establishment of TMDLs only for "suitable" pollutants, 33 U.S.C. § 1313(d)(1)(C), and although a 1978 EPA regulation provides that "all pollutants [regulated by the CWA] are suitable for the calculation of total maximum daily loads," 43 Fed. Reg. at 60,665, EPA conceded at oral argument that nothing forecloses the agency from reconsidering that position. Given that EPA's entire justification for establishing non-daily loads is that certain pollutants are unsuitable for daily load limits, we are at a loss as to why it neglected this straightforward regulatory fix in favor of the tortured argument that "daily" means something other than daily.

446 F.3d at 146 (alterations omitted). The same question arises here: if measuring the amount of trash that enters a river is so difficult, why has EPA designated trash as "suitable for the calculation of total maximum daily loads?"

"expression . . . in terms of trash to be captured, prevented from entering, or removed from the waterbody is an 'appropriate measure'"). Even if an agency's regulation could defeat the unambiguous meaning of a statute (which it cannot), the context clearly indicates that the phrase "other appropriate measure" refers to another appropriate <u>unit of measurement</u>, such as volume per time, and not another "appropriate" expression of the TMDL's substantive requirements. See Chang v. USCIS, No. 16-CV-1740, 2018 WL 746081, at *5 (D.D.C. Feb. 7, 2018) ("The structure of the regulatory language—a list of specific items separated by commas and followed by a general or collective term—supports the inference embodied in ejusdem generis that the agency remained focused on this common attribute when it used the catchall phrase." (citation and alterations omitted)). For example, the Trash TMDL here is expressed in terms of an undoubtedly "appropriate measure," weight per time: it requires "3,458.9 <u>pounds</u> of trash to be prevented from entering, captured, or removed from the Anacostia River <u>on a daily basis</u>." EPA MSJ at 24 (emphases added) (citing AR 3114–3115). This confirms that the regulatory phrase "other appropriate measure" has a different meaning than the one the EPA ascribes to it.

Intervenor-defendant D.C. Water offers a slightly more creative argument in defense of the Trash TMDL. Instead of arguing that the terms "maximum" and "load" are ambiguous, D.C. Water concedes that the terms have an unambiguous meaning but nonetheless claims that the Trash TMDL comports with that meaning: "[t]he Trash TMDL defines the 'maximum load,' or 'loading capacity,' by numerically identifying the amount of trash that must be prevented from discharge and determining that the modest amount of trash that reaches the waterway beyond that baseline is the maximum load for the river." D.C. Water MSJ at 20. This definition is sufficient, D.C. Water contends, because the CWA requires only that a TMDL be "established at a level necessary to implement the applicable water quality standards," 33 U.S.C. § 1313(d)(1)(C), and because

14

here, the Anacostia River's narrative water quality standards essentially call for "a subjective determination of what amounts to nuisance conditions," D.C. Water MSJ at 22.

D.C. Water is certainly correct that the Anacostia River's water quality standards use qualitative descriptors instead of quantitative values, see D.C. Mun. Regs. tit. 21, § 1104.3; Md. Code Regs. 26.08.02.03(B)(2), and that as a result, reasonable people could disagree over exactly how much trash pollution is enough to violate them. But this just means that the maximum permissible quantity of trash cannot be known with precision; it does not follow that that maximum may fluctuate from year to year. And as D.C. Water concedes, see D.C. Water MSJ at 22, the "maximum" purportedly set by the Trash TMDL would do just that: because the Trash TMDL requires that a certain quantity of trash be <u>removed</u> from the river every year, the amount of trash <u>remaining</u> in the river will vary each year as the amount of trash that enters the river varies, see Pl.'s Reply at 6 (noting that "a removal-based approach to a TMDL is the functional equivalent of setting an upper limit on pollution only if pollution loading is constant and uniform over time," and that while "some pollutants show up in some waterbodies [like] clockwork," "trash in the Anacostia River is not among them"). Indeed, it is logically possible that, in any given year, a sufficient amount of trash could enter the river such that even if the <u>average</u> annual discharge were removed (as the Trash TMDL requires), any reasonable observer would agree that the amount of trash remaining in the river was objectionable. Even under D.C. Water's reading, therefore, the Trash TMDL neither sets an "upper limit" on the amount of trash that can enter the river nor identifies "the greatest quantity [of trash] attainable" before water quality standards are breached. <u>Maximum</u>, <u>Webster's Third</u> 1396. It therefore does not establish a "maximum daily load" within the plain meaning of that phrase, and EPA's contrary determination was inconsistent with the CWA and will be set aside.

As a final matter, it remains for the Court to determine the appropriate remedy. NRDC urges the Court to vacate EPA's approval of the Trash TMDL, to remand to the agency with instructions to establish a new TMDL for trash in the Anacostia River "within a reasonable amount of time," and to stay its order of vacatur until the new TMDL is complete. Pl.'s Mot. for Summ. J. at 28. For its part, EPA asks the Court to remand without vacatur and without setting a time limitation or requiring the agency to take any specific action on remand. See EPA MSJ at 39–40.

"The decision whether to vacate depends on [1] 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change that may itself be changed.'" Anacostia Riverkeeper II, 713 F. Supp. 2d at 52 (quoting Allied–Signal, Inc. v. U.S. Nuclear Reg. Comm'n, 988 F.2d, 146, 150–51 (D.C. Cir. 1993)); see id. at 55–56 (vacating several TMDLs but staying the Court's order of vacatur to allow the relevant agencies time to develop replacement TMDLs). Here, "EPA's erroneous conclusion that it could express TMDLs in terms of" an amount of pollution that is removed from or prevented from entering the Anacostia River "is unquestionably a material deficiency in the regulation." Id. at 52. True, "the second Allied–Signal factor—the disruptive effect of vacatur—weighs in favor of remand without vacatur," because neither party wants the river to go without a TMDL for any period of time. Id. But as was true in Anacostia Riverkeeper II, any disruption can be "mitigated, if not eliminated, by staying vacatur." Id. Thus, the Court will vacate EPA's decision to approve the Trash TMDL but stay its order of vacatur until such time as the EPA approves a replacement TMDL for trash in the Anacostia River. In the meantime, the existing Trash TMDL will remain in place and will have the same legal effect as before the Court's order.

16

The Court will not, however, direct EPA to establish a new TMDL within a "reasonable amount of time," as NRDC requests. The APA already requires agencies to act diligently, see 5 U.S.C. § 706(1) (authorizing courts to "compel agency action . . . unreasonably delayed"), and although the Court fully expects EPA to comply with that requirement on remand, see EPA MSJ at 40 (representing that the Court "can and should presume that . . . EPA will act diligently"), there is no need to impose an independent time limit as part of the Court's order. Nor will the Court require EPA to take any specific action on remand. Rather, the Court will leave it to EPA to decide whether to cooperate with DOEE and MDE to develop a new trash TMDL, see 33 U.S.C. § 1313(d)(1)(C) (contemplating that, in the first instance, EPA will work with state agencies to establish TMDLs), or instead to "disapprove[]" the Trash TMDL and thereby trigger the agency's statutory responsibility to establish a federal TMDL within thirty days, see id § 1313(d)(2) ("If [EPA] disapproves [a state's TMDL], [it] shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as [it] determines necessary to implement the water quality standards applicable to such waters . . . .").

## CONCLUSION

For the foregoing reasons, NRDC's motion for summary judgment will be granted, and EPA's and D.C. Water's cross-motions for summary judgment will be denied. A separate order has been issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: March 30, 2018

17