UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., <br><br> Plaintiff, <br><br> v. <br><br> ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Civil No. 16-1861 (JDB) |

## MEMORANDUM OPINION

Plaintiff Natural Resources Defense Council, Inc. ("NRDC") has moved under Federal Rule of Civil Procedure 54(b) for the Court to reconsider its 2018 decision giving defendant Environmental Protection Agency ("EPA") discretion as to how to establish a new total maximum daily load ("TMDL") for trash in the Anacostia River.  NRDC contends that little progress has been made since that 2018 decision and that the Court should require EPA to have a TMDL in place within one year.  EPA opposes, arguing that development of the TMDL is continuing apace and that NRDC has not met the high standard for reconsideration under Rule 54(b).  For the reasons that follow, the Court agrees with EPA and will deny the motion.  However, given the slow pace of development to date, the Court will require EPA to submit status updates every three months going forward.

## Background

I. The Clean Water Act

The Clean Water Act, passed in 1972, requires states and the District of Columbia to "institute comprehensive water quality standards establishing water quality goals for all intrastate

1

waters." PUD No. 1 of Jefferson Cty. v. Wash. Dep't of Ecology, 511 U.S. 700, 704 (1994); see 33 U.S.C. § 1313(a)–(c). The Act embodies a "cooperative federalism framework" whereby the states and EPA "work[] together to clean the Nation's waters." Am. Farm Bureau Fed'n v. EPA, 792 F.3d 281, 288 (3d Cir. 2015). At issue in this case is one component of that complex statute, calling for the establishment of a "total maximum daily load" of pollutants in certain waters. See 33 U.S.C. § 1313(d)(1)(C).

The creation of a TMDL is just one part of a multistep process, with each step "placing primary responsibility for pollution controls in state hands with 'backstop authority' vested in the EPA." Am. Farm Bureau Fed'n, 792 F.3d at 289. At the first step in the process, a state is required to identify a given waterbody's "designated use[]," such as recreation or wildlife preservation. See Nat. Res. Def. Council v. EPA ("NRDC I"), 301 F. Supp. 3d 133, 136–37 (D.D.C. 2018) (quoting 33 U.S.C. § 1313(c)(2)(A)). The state must then set a target water quality based on that use. See id. at 137. At this point, EPA must either approve or disapprove the water quality standards; if EPA disapproves, it must set its own standards for the waterbody. See 33 U.S.C. § 1313(a)(3)(A)-(C) & (b).

Next, the state must "identify those waters within its boundaries" that do not meet the established water quality standards, otherwise known as impaired waters. Id. § 1313(d)(1)(A). For those impaired waters, the Act requires, in the first instance, states—not EPA—to establish a TMDL for the pollutants causing the impairment. Id. § 1313(d)(1)(C). The TMDL must be set "at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." Id.; see Nat. Res. Def. Council v. Muszynski, 268 F.3d 91, 94 (2d Cir. 2001) ("In effect, a TMDL posts a limit on the total amount of a pollutant a

2

waterbody may receive over a period of time."). Once a state has established a TMDL for the pollutants in a given waterbody, the state must submit the TMDL to EPA for approval. See 33 U.S.C. § 1313(d)(2). Here again, EPA must either approve or disapprove the state TMDL, this time within thirty days, and if EPA disapproves, it must establish its own federal TMDL within thirty days of that disapproval. Id.

The Act does not itself set a deadline for when a state is required to establish and submit a TMDL to EPA. It largely leaves that judgment up to the state, requiring only that the state submit TMDLs "from time to time," "in accordance with [the state's] priority ranking" for its waters, which must "tak[e] into account the severity of the pollution and the uses to be made of such waters." Id. § 1313(d)(1) & (2). In the years since the Act was enacted, courts have acknowledged that "TMDLs take time and resources to develop and have proven to be difficult to get just right." Upper Blackstone Water Pollution Abatement Dist. v. EPA, 690 F.3d 9, 14 n.8 (1st Cir. 2012); see, e.g., S.F. BayKeeper v. Whitman, 297 F.3d 877, 881 (9th Cir. 2002) ("The development of TMDLs to correct the pollution is obviously a more intensive and time-consuming project than simply identifying the polluted waters."); see also Am. Farm Bureau Fed'n, 792 F.3d at 308 (discussing portions of the Act's legislative history stating that developing a TMDL will be "time consuming and difficult").

Still, some courts have also recognized that, at some point, delay is unacceptable under the Act, and have established what is known as the "constructive submission" doctrine to identify when a delay becomes problematic. See Ohio Valley Envtl. Coal., Inc. v. Pruitt, 893 F.3d 225, 229 (4th Cir. 2018). Under that doctrine, "a prolonged failure 'by a state to submit TMDLs will be construed as a constructive submission of no TMDLs, which in turn triggers EPA's nondiscretionary duty to act'"—that is, the duty to establish a federal TMDL within thirty days.

3

Id. (quoting S.F. BayKeeper v. Whitman, 297 F.3d 877, 881 (9th Cir. 2002)).  The doctrine generally "applies only where a state 'clearly and unambiguously' expresses a decision not to submit TMDLs."  Id. at 230 (quoting Hayes v. Whitman, 264 F.3d 1017, 1024 (10th Cir. 2001)).  Courts endorsing this doctrine reason "that, without it, states could refuse to promulgate their own TMDLs and therefore easily frustrate" the Act.  Id. at 229–30.

## II. The Anacostia River

The Anacostia River, spanning more than 170 square miles, flows from Maryland to the District of Columbia.  NRDC I, 301 F. Supp. 3d at 138.  As required by the Act, Maryland and D.C. "have each established designated uses and water quality standards applicable to their portions of the Anacostia River."  Id.  Both jurisdictions determined that the river was impaired by trash pollution.  See id.  Therefore, between 2009 and 2010, they jointly developed a TMDL to limit the amount of trash in the Anacostia River and submitted it to EPA.  See id. at 138–39.  In reviewing the TMDL, EPA acknowledged that "[u]nlike most TMDLs, which are expressed in positive terms of the loads of a pollutant that may be added to a waterbody," the joint TMDL was "expressed in the negative, i.e., in terms of quantities of trash that must be captured, prevented from entering, or removed from the waterbody."  Id. at 139 (quoting Admin. R. [ECF No. 26] at 3114).  EPA nonetheless approved the TMDL on September 21, 2010.  Id.

NRDC filed this suit in September 2016, challenging EPA's approval of the TMDL under the Administrative Procedure Act ("APA").  See id. at 140.  NRDC eventually moved for summary judgment, arguing that by "set[ting] a minimum amount of trash that must be removed," instead of "setting a maximum daily amount of trash that can enter the river," the TMDL violated the Act's requirement that states set a "total maximum daily load" for the river.  Id.  On March 30, 2018, the Court agreed and granted NRDC's motion, concluding that the TMDL did "not establish a

4

'maximum daily load' within the plain meaning of that phrase." Id. at 145.  The Court therefore vacated and remanded EPA's approval of the TMDL, staying vacatur "until such time as the EPA approves a replacement TMDL."  See id. at 136, 145.  But the Court declined to grant NRDC's request that a specific deadline be imposed on EPA for the establishment of a new TMDL.  See id. at 145.  The Court "le[ft] it to EPA to decide whether to cooperate with [Maryland and D.C.] to develop a new trash TMDL, . . . or instead to 'disapprove[]' the [existing] TMDL and thereby trigger the agency's statutory responsibility to establish a federal TMDL within thirty days." Id.

Rather than disapproving the existing TMDL, EPA opted to cooperate with Maryland and D.C., giving them primary responsibility for developing the replacement TMDL. See July 2, 2018 Status Report by Def. EPA [ECF No. 31] at 2.  EPA has been submitting status reports to the Court every six months as to the state agencies' progress in developing the new TMDL, with the most recent report having been filed on February 19, 2020.[1]  See Feb. 19, 2020 Status Report by Def. EPA [ECF No. 41] at 1.

In January 2020, NRDC filed this motion for the Court to reconsider its 2018 decision and impose a one-year deadline on EPA to establish a TMDL, contending that the TMDL-development process was proceeding too slowly and "denying legally mandated protections to the river, the communities along its banks, and those who come to enjoy it." Pl.'s Mot. to Set a Deadline for Final Action on Remand ("Deadline Mot.") [ECF No. 39] at 1.  Partway through briefing, NRDC served EPA with eight requests for document production and noticed a deposition of an EPA official who had filed a declaration in support of EPA's opposition.  Nat. Res. Def. Council v. EPA ("NRDC II"), 2020 WL 2849624, at *1 (D.D.C. June 2, 2020).  EPA then moved for a protective order, arguing that the discovery sought was improper.  See id. at *2.  The Court denied that motion

---

[1] Given the briefing schedule for the present motion, EPA has not been required to file a status report since February.  As noted below, the Court will impose a more frequent status report schedule going forward.

and permitted NRDC to conduct very limited discovery. See id. at *1. In the course of doing so, the Court also clarified that Rule 54(b) applies to NRDC's motion to set a deadline, because that motion requests that the Court reconsider a nonfinal order. Id. at *2. The motion to set a deadline is now fully briefed and ripe for decision.

## Discussion

### I.     Legal Standard

Under Rule 54(b), a court may grant relief "as justice requires," Capitol Sprinkler Inspection, Inc. v. Guest Servs. Inc., 630 F.3d 217, 227 (D.C. Cir. 2011), which requires "determining, within the Court's discretion, whether reconsideration is necessary under the relevant circumstances," Cobell v. Norton, 355 F. Supp. 2d 531, 539 (D.D.C. 2005). To determine whether "justice requires" reconsideration of a previously issued interlocutory order, a court considers whether it "patently misunderstood a party[,] . . . has made an error not of reasoning but of apprehension, or [if] a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court." Singh v. George Wash. Univ., 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (citation omitted). Rule 54(b) motions may properly be granted, for instance, where the movant presents the court with "new information" justifying reconsideration of a previous decision. See Doe I v. Exxon Mobil Corp., 2019 WL 2348100, at *3 (D.D.C. June 3, 2019).

"At the same time, a court's discretion under Rule 54(b) is 'limited by the law of the case doctrine and subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" Jordan v. U.S. Dep't of Justice, 2019 WL 2028399, at *2 (D.D.C. May 8, 2019) (quoting Singh, 383 F. Supp. 2d at 101). "The law-of-the-case doctrine dictates that the same issue presented a second

6

time in the same case in the same court should lead to the same result," absent extraordinary circumstances. Al Bahlul v. United States, 967 F.3d 858, 875 (D.C. Cir. 2020) (quotation omitted).

## II.     Analysis

NRDC argues that "new information" has come to light that should make the Court reconsider its prior decision not to impose a deadline on EPA. Prior to conducting its limited discovery, NRDC could rely for support only on the "new information" of what it called the slow and "meander[ing]" pace of development. See Deadline Mot. at 1, 3–4. Following discovery, NRDC now also points to the "inaccurate and unreliable" declaration submitted by an EPA official, noting that the official's declaration had previously estimated that the TMDL would be completed in three to five years, but that the official's deposition had revealed that she now thinks five to seven years will be required. See Reply in Supp. of Pl.'s Mot. to Set a Deadline for Final Action on Remand ("NRDC Reply") [ECF No. 53] at 2–3, 6.

In EPA's view, the facts that NRDC has put forth are insufficient to establish that "a controlling or significant change in the law or facts has occurred since the [original] submission of the issue to the Court." Def.'s Sur-Reply Opposing Pl.'s Mot. to Amend the J. & Impose a Deadline on Remand ("EPA's Sur-Reply") [ECF No. 55] at 2–3 (quoting Scahill v. District of Columbia, 286 F. Supp. 3d 12, 17–18 (D.D.C. 2017)). To the contrary, EPA asserts, "[t]he facts shown in hundreds of documents, multiple status reports, sworn declarations, and a deposition" demonstrate that the states and EPA "have been working diligently on remand and have made steadfast progress over the past two years." Id. at 1. As a result, EPA argues that the "new information" that NRDC has presented is insufficient to satisfy Rule 54(b). See id. at 4–5, 9. Likewise, EPA maintains that NRDC has not adequately justified overriding the law of the case

7

on this issue, which is that EPA is permitted to let Maryland and D.C.'s own TMDL-development process play out. See id.

With some reluctance, the Court agrees with EPA. At summary judgment more than two years ago, the parties battled over whether the Court should set a deadline for development of a replacement TMDL. See Pl.'s Mot. for Summ. J. [ECF No. 10] at 15; Def.'s Cross-Mot. for Summ. J. [ECF No. 15] at 39–40. The Court's 2018 decision resolved that issue in favor of EPA, declining to set such a deadline. See NRDC I, 301 F. Supp. 3d at 145. That is the law of the case. And district courts should "be 'loathe' to reconsider issues already decided 'in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988)).

The only concrete new fact that NRDC has put forward in support of its motion for reconsideration of the Court's 2018 decision is the passage of time—as of the date of this opinion, about two and a half years since the existing TMDL was vacated. The Court acknowledges and indeed shares, to some extent, NRDC's displeasure with the pace of development of the replacement TMDL thus far. The Court, too, would prefer that a new TMDL be established and implemented as soon as possible. However, the Court will not now do what the Clean Water Act does not itself do—establish a firm timeline for the submission of a TMDL by the states to EPA. It is an unfortunate reality that the development of a TMDL sometimes takes several years, or even a decade in extreme cases. See Am. Farm Bureau Fed'n, 792 F.3d at 291–92 (noting that development of a final TMDL for the Chesapeake Bay took ten years); Sierra Club v. McLerran, 2015 WL 1188522, at *3–4 (W.D. Wash. Mar. 16, 2015) (quoting EPA material noting that development of TMDL for Spokane River took twelve years); Order, Nw. Envt'l Advocates v.

8

EPA, Case No. 12-cv-1751 (D. Or. June 11, 2019) (setting four-to-eight year schedule for development of TMDLs); Anacostia Riverkeeper, Inc. v. Jackson, 713 F. Supp. 2d 50, 55 (D.D.C. 2010) (affording EPA four years to develop new TMDLs); see also Envtl. Law & Policy Ctr. v. EPA, 415 F. Supp. 3d 775, 778–79 (N.D. Ohio 2019) ("EPA guidance documents suggest that states should establish TMDLs within 8 to 13 years from the date of the original listing of a particular waterbody as impaired." (quotation omitted)); 43 Fed. Reg. 60,662, 60,665 (Dec. 28, 1978) ("EPA recognizes that State development of TMDLs and wasteload allocations for all water quality limited segments will be a lengthy process.").[2] The Court's 2018 decision did not require or suggest that a replacement TMDL be established within a specific timeframe, beyond noting that EPA was required by the APA to "act diligently." NRDC I, 301 F. Supp. 3d at 145. The two and a half years that have elapsed in this case—though undoubtedly an understandable source of frustration for NRDC—are simply not enough to justify a reconsideration of the Court's prior decision.

Nor are NRDC's attacks on the validity of the EPA official's declaration availing, because they largely ignore the fact that EPA is not the entity developing the replacement TMDL—Maryland and D.C. are, as contemplated under § 1313(d)(1)(C) and the Act's "cooperative federalism framework," see Am. Farm Bureau Fed'n, 792 F.3d at 288. Hence, while EPA has taken on a coordinative and facilitative function in the TMDL-development process, it cannot itself dictate how quickly the process proceeds, but instead can provide only estimates based on information from Maryland and D.C. and the EPA official's past experience with them. With that

---

[2] In fact, even the four-year deadline in Anacostia Riverkeeper that this Court set in 2010 turned out to be too optimistic. The Court has since extended the deadline to September 30, 2021—a total timeline of nearly eleven years. See Order [ECF No. 49], Anacostia Riverkeeper, Inc. v. Wheeler, Case No. 09-cv-98, at 1–3.

in mind, NRDC's criticisms of the official's declaration do not persuade the Court to reconsider its 2018 decision.

For instance, one of NRDC's main criticisms is that the official's original estimate of three to five years, which her deposition revealed was based on "her observations of how long it has [previously] taken the [state agencies] to complete various TMDL development tasks," has now increased to five to seven years. See NRDC Reply at 2–4. As she stated at her deposition, the official came to her new estimate after "[w]riting out the steps that would—the substeps, really, that would be needed" under the first step of the development timeline. Ex. 1, NRDC Reply [ECF No. 53-1] at 18–19. That consists primarily of developing, designing, implementing, and analyzing the results of a public survey. See id. at 20. The Court shares NRDC's concerns about the process that led to the apparently inaccurate estimate in the official's original declaration. An estimate it may have been, but presumably EPA intended for that estimate to be helpful to the Court. The Court would expect that something as simple as writing out the substeps of each step of an estimate would have been done prior to the submission of a sworn declaration to the Court.

Still, whatever the deficiencies in EPA's estimation process that led to a two-year increase between the submission of the official's declaration on February 28 and her deposition on June 30, the fact remains that Maryland and D.C. have the leading role in developing the replacement TMDL. As EPA points out, "the States are developing the replacement TMDLs through their respective State programs and administrative processes." EPA Sur-Reply at 13. Thus, uncertainty on EPA's part as to how long the TMDL-development process will take does not constitute "a controlling or significant change in the law or facts . . . since the submission of the issue to the Court." Singh, 383 F. Supp. 2d at 101. Indeed, the Court specifically contemplated that EPA might take a backseat to Maryland and D.C. in developing the replacement TMDL in its 2018

decision.  See NRDC I, 301 F. Supp. 3d at 145.  For better or worse, EPA has done just that here.  That fact, then, does not justify the Court's changing its decision.

NRDC also cites, in passing, a few cases applying the constructive submission doctrine.  But those cases don't help NRDC's cause, either.  As recently stated by the Ninth Circuit, that doctrine applies "where a state has fail[ed] over a long period of time to submit a TMDL and clearly and unambiguously decided not to submit any TMDL[s]."  Columbia Riverkeeper v. Wheeler, 944 F.3d 1204, 1209 (9th Cir. 2019) (internal quotation marks omitted).  That is not the situation here.  Maryland and D.C. previously submitted the existing (deficient) TMDL, which remains in effect today because of the Court's stay of vacatur.  They have not failed to submit any TMDLs.  See Hayes, 264 F.3d at 1022, 1024 (concluding that because Oklahoma had submitted "at least a small number" of TMDLs, the constructive submission doctrine did not apply).

Moreover, Maryland and D.C. have not "clearly and unambiguously decided" not to submit a TMDL.  Even leaving aside the TMDL the states already submitted, EPA has put forth substantial documentation demonstrating that Maryland and D.C. have been reaching out to stakeholders, analyzing data, soliciting advice from authorities in other regions of the country, and working to settle on a final approach for the TMDL.  See EPA's Sur-Reply at 5–8; see generally Ex. A, EPA's Sur-Reply [ECF No. 55-2] (documentation of EPA's and the states' efforts).  EPA therefore does not rely only, as NRDC suggests, on the EPA official's "declaration as proof that the Agencies are working hard."  NRDC Reply at 6.  NRDC has not identified any evidence suggesting that Maryland and D.C. have decided not to submit a TMDL.  Thus, far from "clearly and unambiguously express[ing] a decision not to submit [a] TMDL," Ohio Valley Envtl. Coal., 893 F.3d at 229, Maryland and D.C. have demonstrated progress toward establishing one—even if that progress is slower (perhaps much slower) than NRDC and the Court would like.  See Anacostia

Riverkeeper, Inc., 713 F. Supp. 2d at 54 ("[W]here an agency justifies its conclusions with evidence, courts should not substitute their own predictions about the length of time an agency needs to evaluate data . . . , especially where those predictions turn on scientific matters.").

For all these reasons, the Court concludes that NRDC has failed to present adequate "new information" demonstrating a "controlling or significant change in the law or facts" since the Court's 2018 decision, as required for reconsideration under Rule 54(b), nor has it established "extraordinary circumstances," as required to override the law-of-the-case doctrine.  Still, the Court continues to urge EPA, Maryland, and D.C. to develop a TMDL "diligently" and as quickly as possible, consistent with the scientific method and practical standards.  See NRDC I, 301 F. Supp. 3d at 145.  Furthermore, EPA should be on notice that the Court does not foresee permitting this process to drag on interminably, and may at some point in the not-too-distant future look more favorably upon a motion like this one.  At least for now, however, the Court will not reconsider its 2018 decision not to impose a deadline.  But it will require increased reporting in order to monitor the continuing progress the Court expects.

## Conclusion

For the foregoing reasons, the Court will deny NRDC's motion to set a deadline for final action on remand.  The Court will also require EPA to submit detailed status reports every three months going forward, with the first report due not later than October 15, 2020.  A separate order will be issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: September 21, 2020